UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CR. NO. 18-146 (JDB) |
| ISABELLE GARCIA | ) | |

**MEMORANDUM IN AID OF SENTENCING**

In her letter to this Honorable Court, Ms. Garcia's sister Magali describes how their 84 year old ailing father has been "devastated by her sudden arrest…He regularly ask for Isabelle, his first child."  Magali prays that their father "stays alive waiting for Isabelle['s] return. …[She] would like her to take care of him like she did for our mother who died in 2018 after a long disease." In her letter, Magali asks the Court for compassion.  Ms. Garcia has "already dearly paid in spending more than one year in a [M]oroccan jail. The detention conditions have been physically and psychologically very difficult."

In *Just Mercy: A Story of Justice and Redemption*, Bryan Stevenson stated, "[e]ach of us is more than the worst thing we've ever done."[i]  The § 3553(a) factors recognize this because it requires the Court to examine the history and characteristics of the defendant to see that he or she is more than the offense committed.  Ms. Garcia is much more than the offense in this case.  She is a devoted daughter, a hard worker, and a caring friend.  Based on the nature and circumstances of the offense, her background, acceptance of responsibility, and the relevant § 3553(a) sentencing factors, the defense respectfully requests a sentence of 12 months and 1 day, which is fair and reasonable.

1

**Case Background**

On May 15, 2018, an indictment was filed against Ms. Garcia charging her with Wire Fraud, in violation of 18 U.S.C. § 1343 (Counts 1 and 2); Bank Fraud, in violation of 18 U.S.C. § 1344(2) (Count 3); First Degree Fraud, in violation of 22 D.C. Code §§ 3221(a), 3222(a)(1) (Count 4).  Ms. Garcia was arrested in Morocco in 2019 and detained there for 14 months before being extradited to the U.S. in December 2020.  Approximately 6 months later, the parties reach an agreement to avoid trial and on July 2, 2021, Ms. Garcia pled guilty to Count 1 of the Indictment.  In exchange for her guilty plea, the government offered to dismiss the remaining charges and ask the Court for a sentence at the bottom of the guideline range.

**Sentencing Law**

**1.  History – From unfettered discretion to Guideline bound.**

For 200 years, federal judges had wide discretion when it came to sentencing and could sentence how they saw fit and "there was virtually no appellate review of the trial judge's exercise of sentencing discretion."[1]  Former federal judge, Marvin E. Frankel was the "most influential critic[] of indeterminate federal sentencing" and in 1972, he published a "forceful …. indictment of the sentencing authority he himself exercised--powers which he described as 'almost wholly unchecked and sweeping' and which he found 'terrifying and intolerable for a society that professes devotion to the rule of law.'"[2]  Judge Frankel called for a "Commission on Sentencing" and the enactment of laws to make guidelines that would be "binding" on federal judges.[3]  Congress answered Judge Frankel's call and in 1984 the Sentencing

---

[1] Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225 (1993).
[2] *Id.* at 228.
[3] *Id.* at 228.

Commission was born. For decades, the U.S. Sentencing Guidelines were binding.

The era of binding guidelines ended sixteen years ago, when the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively ***advisory***." *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added). Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider <u>all</u> the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Overall, in light of *Booker*, courts must treat the Guidelines as <u>one</u> among several of the sentencing factors.

18 U.S.C. § 3553(a) provides that the Court must consider:

   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2) the need for the sentence imposed—

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B) to afford adequate deterrence to criminal conduct;
      (C) to protect the public from further crimes of the defendant; and
      (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

   (3) the kinds of sentences available;

   (4) the kinds of sentence and the sentencing range established for—

      (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress

>> (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …
>
> (5) any pertinent policy statement— …
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id*. § 3553(a) (emphasis added).

4

### 2. The Sentencing Guidelines are *only one factor*, thus Courts must not anchor themselves to the Guidelines.

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007). A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. *Id.* By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351.

It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

Overall, judges are encouraged to resist "anchoring" the sentence on the guideline numbers. "Anchoring is a cognitive bias that describes the human tendency to adjust judgments or assessments higher or lower based on previously disclosed external information - the 'anchor.' Studies demonstrate 'that decisionmakers tend to focus their attention on the anchor value and to adjust insufficiently to account for new information.'" Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Sot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489, 495 (2014) (citations omitted).

> It is important to distinguish the guidelines' intended, salutary effect - promoting consistency and proportionality in sentencing - from the unintended anchoring effect that the guidelines can exert. … Anchoring leads to cognitive error not insofar as judges intentionally use the guidelines in an advisory fashion, but instead when judges irrationally assign too much weight to the guidelines range, just because it offers some initial numbers.

*Id.* at 524 (inner quotation marks and citation omitted); *see also United States v. Docampo*, 573 F.3d 1091, 1105 n.5 (11th Cir. 2009) (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a district court's analysis").

Another reason to resist anchoring a sentence to the Guidelines is that the guidelines are not always based on empirical data. "A district court may deviate from a sentencing guideline where empirical data shows that adherence to it would yield a sentence that is 'greater than necessary.'" *United States v. Price*, 649 F.3d 857, 860 (8th Cir. 2011) (quoting *Kimbrough v. United States*, 552 U.S. 85, 109-10, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007)).

6

**Argument**

For the following reasons, a sentence of 12 months and 1 day is the only sentence that is not greater than necessary, yet sufficient, for the purposes of sentencing.

**I.      The Nature and Circumstances of the Offense**

The offense conduct is detailed in the Statement of Offense. ECF No. 22. As stated in the Objections to the Presentence Investigation Report, the defense notes that Ms. Garcia accepts responsibility for her actions. However, the Court should note that she pled to the Statement of Offense to which the parties agreed. Ms. Garcia did not did not put the government to its burden of proof at trial where some of the "Additional Information Provided by the U.S. Attorney in this Matter" could have been disputed.

**II.     Ms. Garcia's History and Characteristics**

*a. Background and Upbringing*

Ms. Garcia is a 56 year old woman, born in Toulouse, France to married parents. She was raised in and lived most of her life in her family's home in Aussonne, France. She is very close to her two sisters, Magali and Sophie. In one of her letters, Magali describes how Ms. Garcia's "family comes first."[4] This is consistent with Ms. Garcia's statement during the PSR interview that growing up in France, family is first. She took care of her mother before she died in 2018. She was working and caring for her ailing father before her arrest and detention for this case in 2019 in Morocco.

Ms. Garcia has no criminal history. While the PSR notes that she "pled guilty" in a traffic offense, the court record also shows that he was not present for that event and simply paid a fine.[5]

---

[4] Letter from Magali Garcia, September 3, 2021 letter (Exhibit 1)
[5] See Pennsylvania court record filed under seal (Exhibit 2).

b. *Character*

Her family describes her as caring and generous. Her niece describes how Ms. Garcia would give her gifts when she received her report card.[6] Ms. Gonzalez, who is detained at CTF with her, describes Ms. Garcia as a "respectful, caring and loving person."[7] She looks at Ms. Garcia as a "Mother" since Ms. Garcia gives her support when she is sad and advises her "like a Mother would do."[8] Ms. Gonzalez continues:

> I feel she has been through a real hard time when she was arrested and incarcerated for months in Morocco. This time in a Moroccan jail helped make her the nice human person she is. I can tell she appreciates life and miss her family greatly, especially her elderly and sick Father.
>
> I pray, Your Honor, that you have mercy and give her a second opportunity to start all over next to her Father and loved ones.

While detained for this offense, Ms. Garcia acquired certificates, most notably a Certificate of Employee Appreciation for her hard work, dedication and support as an On-Unit Office Detail Assistant at the Department of Corrections.[9] Ms. Garcia is also described as "intelligent, compassionate, and motivated" in the book club and writing workshop she attends at the Correctional Treatment Facility.[10]

c. *Detained in Morocco*

Ms. Garcia details how her time in Morocco was distressing and caused her PTSD.[11] Her sister Magali and her daughter were present when she was arrested in October 2019.[12] In

---

[6] Letter from Niece (Exhibit 3), under seal.
[7] Letter from Ms. Gonzalez, (Exhibit 4).
[8] Id.
[9] Certifications and Certificates (Exhibit 5).
[10] Writing Workshop Founder, Kelli Taylor, Co-founder, Free Minds Book Club & Writing Workshop, and Garcia poems (Exhibit 6).
[11] The defense plans to supplement this section with a psychologist report, which is forthcoming.
[12] Letter from Magali, dated July 3, 2021 (Exhibit 7).

addition, Ms. Garcia's passport shows that she was in Morocco on October 18, 2019. She was detained at the Tiflet 2 prison in Morocco, which had previously been investigated by the United Nations for violating the Convention Against Torture Act.[13] Ms. Garcia describes how she was one of 80 female inmates and there were 8 inmates per cell. In December 2019, for a few days, the number went up to 11 inmates per cell because of the lack of space. The inmates slept on beds built of concrete without mattresses and sheets. They were given thin, dirty blankets to cover themselves. The cells had 2 toilets in the floor and 1 sink and 4 windows with metal bars. Because of the smell, the windows were kept open, which meant they were freezing in the winter and "suffocated in the summer."[14] They were confined to their cells for 23 hours a day. The COVID-19 pandemic made things worse in Ms. Garcia's case moving forward and undoubtedly heightened the health risks that she and other inmates faced.[15]

Ms. Garcia accepts responsibility for her actions and is very remorseful.[16]

---

[13] See U.N. Committee against Torture, Decision adopted by the Committee under article 22 of the Convention, concerning communication No. 817/2017, (Nov. 25, 2019), available at https://undocs.org/pdf?symbol=en/CAT/C/68/D/817/2017, last accessed Oct. 8, 2021. (Attached as Exhibit 8)

[14] Letter from Ms. Garcia regarding Morocco (Exhibit 9), filed under seal.

[15] See e.g., Por Un Shara Libre.org article, *Mohamed LAMIN HADDI, still in hunger strike, facing Covid 19*, Jan. 17, 2021, available at https://porunsaharalibre.org/2021/01/17/mohamed-lamin-haddi-still-in-hunger-strike-facing-covid-19/?lang=en, last accessed on Oct. 8, 2021 (explaining how Haddi, an inmate at Tiflet2, "did not receive any visit since March 2020 because of the Covid-19 and never exits his cell because he is in prolonged isolation since 2017" and how he "is not entitled to have warm food while it is a hard winter and he has nothing in his cell; not even a blanket. He did not see a doctor after all these years although he is suffering from the consequences of the torture he has been subjected and the detention condition he is submitted to now for 3 years.") (Attached as Exhibit 10).

[16] Letter from Ms. Garcia, Oct. 5, 2021 (Exhibit 11).

**III.     The Purpose of Sentencing Will be Accomplished with a Sentence of 12 months and 1 day.**

The Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553 (a).

**A.     The Requested Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A lengthy term of incarceration is not required in order for a sentence to reflect the seriousness of the offense. Even a sentence of probation "rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

To determine a just punishment for Ms. Garcia, the Court must consider how she will serve his time. Since the beginning of the COVID-19 pandemic, inmates have served time under harsher conditions – movement is limited, visits were suspended, and clients have been detained in their cells for a large majority of the day. While the Bureau of Prisons has gone through several phases to modify restrictions on inmates, social visits are limited to maintain safety, and "[i]nmate movement in small numbers is authorized for…showers three times each week."[17] Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers

---

[17] *See* Fed. Bureau of Prisons, *BOP Modified Operations* (Updated Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed September 29, 2021).

10

show that 259 inmates have died from COVID-19.[18]  With the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates, even for those who have been vaccinated because of breakthrough infections.[19]

The Sentencing Commission's recent data does not accurately acknowledge the impact COVID-19 has had on serving time.  Reportedly, federal judges have given downward variances in 2.5% of cases based on COVID-19; however, the Commission data includes cases 6 months before the pandemic, spanning from October 2019 to September 2020.[20]  While the Commission has made no recommendations on adjusting sentences based on the harshness of serving time during the pandemic, many federal judges have addressed the impact COVID-19 has on those serving a sentence.  One federal judge has explained

> Most of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming. And **I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think having served 24 months is equivalent to having served three years.** That's what I believe in terms of how punitive it's been and how harsh it's been.

Sentencing Tr. at 17-18, *United States v. Gonzalez*, Case No. 1:18-cr-00669-JPO, ECF No. 250 (S.D.N.Y. April 2, 2021) (emphasis added).   In light of the fact that Ms. Garcia had been

---

[18] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed September 29, 2021).
[19] *See* Casey Tolan, Compassionate release became a life-or-death lottery for thousands of federal inmates during the pandemic, Cnn.com, Updated 7:05 am, Sept. 30, 2021, https://www.cnn.com/2021/09/30/us/covid-prison-inmates-compassionate-release-invs/index.html ("In at least one recent case, an inmate died after contracting a breakthrough coronavirus case despite being vaccinated. Rasheem Hicks, 42, who was serving a six and a half-year sentence for cocaine and firearm possession, died late last month about two weeks after testing positive for Covid-19.")
[20] Brian Jacobs, *The U.S. Sentencing Commission's Inadequate Response To Covid-19*, Forbes.com, Sept. 17, 2021, https://www.forbes.com/sites/insider/2021/09/17/the-us-sentencing-commissions-inadequate-response-to-covid-19/?sh=64d4dab27ee8

detained in Morocco under extremely terrible conditions, and through the pandemic, and continues to be detained here, she had been bitterly punished for the offense.

**B.     The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.**

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public has been protected while she has been incarcerated. The public will be protected while Ms. Garcia is being supervised by the Probation Officer on release, which will further deter criminal conduct. Lengthy prison sentences do not mean the public is safe. A 2017 Vera Institute of Justice analysis shows that higher incarceration has diminishing returns for society:

> It may seem intuitive that increasing incarceration would further reduce crime: incarceration not only prevents future crimes by taking people who commit crime "out of circulation" (incapacitation), but it also may dissuade people from committing future crimes out of fear of punishment (deterrence). **In reality, however, increasing incarceration rates has a minimal impact on reducing crime and entails significant costs**....[21]

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l

---

[21] Don Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, July 2017, The Vera Institute of Justice, Vera Evidence Brief, https://www.vera.org/downloads/publications/for-the-record-prison-paradox_02.pdf (last accessed on Sept. 29, 2021) (emphasis added); *see also* Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, Nov. 5, 2018, The Sentencing Project, available at https://www.sentencingproject.org/publications/long-term-sentences-time-reconsider-scale-punishment/ (last accessed on Sept. 29, 2021) ("There is also strong criminological evidence that lengthy prison terms are counterproductive for public safety as they result in incarceration of individuals long past the time that they have 'aged out' of the high crime years, thereby diverting resources from more promising crime reduction initiatives.").

Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).  With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."  *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect.  Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").  A lengthy sentence is not needed to deter criminal conduct in this case.

      **C.**    **The Requested Sentence Would Provide Ms. Garcia with the Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner.**

Under 18 U.S.C. § 3553(a)(2)(D), this Court must also consider "the need for the sentence imposed—. . . to provide the defendant with needed. . . medical care. . . in the most effective manner."  The pandemic will impact the mental health services and programming that Ms. Garcia will need in prison.  The BOP notes that programing is only being offered "to the extent practicable" and that "[i]nstitutions with active COVID-19 cases may make exceptions to these programming requirements for the safety of inmates and staff." [22]  Undoubtedly, because of the pandemic, the conditions an inmate serves under now are harsher than they were before the pandemic.

---

[22] *See* Fed. Bureau of Prisons, *BOP Modified Operations* (Updated Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed December 4, 2020).

**IV.     The Requested Sentence Properly Reflects § 3553(a) Considerations and Adheres to the Principle that this Court May Not Presume that a Guideline Sentence Is Reasonable.**

When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). As stated above, courts should resist anchoring a sentence to the guideline numbers. *See Docampo*, 573 F.3d at 1105 n.5 (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a district court's analysis"). Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita*, 551 U.S. at 348, 350. This Court may not presume that a Guideline sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless." *Id.* at 351. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). Last year, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. **Thus, it is crucial that judges give careful consideration to**

14

> **every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.**

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

### A. Defense Request for A Variance

As set forth in the PSR, the applicable Sentencing Guidelines range is 27-33 months. Ms. Garcia requests that this Honorable Court vary outside of the guidelines in light of her lack of criminal history, her age, and the 14 months she spent under horrendous conditions in a Morocco jail, as stated above.

### B. The Fraud Guidelines are not consistent with Empirical Data.

The Supreme Court has explained that U.S. Sentencing Commission "fills an important institutional role…to 'base its determinations on empirical data and national experience.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). However, when the Commission fails to base guidelines on empirical data and national experience, the district court may determine that a guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 110.

The fraud guidelines were "partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

> [I]n implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, **effectively guaranteed that many such sentences would be irrational on their face.**

15

*Id.* (emphasis added) (sentencing defendant to 24 months incarceration where the calculated gain was $15 million.). Here, a sentence 27-33, based on the loss amount would be contrary to the mandate that the Court consider the many § 3553(a) factors. As stated above, in light of Ms. Garcia's history and characteristics, the time she spent detained in Morocco, and her acceptance of responsibility, a sentence of 12 months and 1 day would comply with the purposes of sentencing.

Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." 552 U.S. at 44 (citation omitted) (quoting district court). As a result, Ms. Garcia requests a sentence of 12 months and 1 day. The requested sentence is not "greater than necessary," and is sufficient for the purposes of sentencing.

## Conclusion

For the foregoing reasons, and for any other reasons set forth at the sentencing hearing, a sentence of 12 months and 1 day sufficiently addresses Ms. Garcia's conduct as well as other factors pursuant to 18 U.S.C. § 3553(a).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

---

[i] Bryan Stevenson, *Just Mercy: A Story of Justice and Redemption* 17-18 (Spiegel & Grau 2014).