# EXHIBIT 8

United Nations
CAT/C/68/D/817/2017



**Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment**

Distr.: General
2 January 2020
English
Original: French

**Committee against Torture**

**Decision adopted by the Committee under article 22 of the Convention, concerning communication No. 817/2017**\*, \*\*

| | |
|---|---|
| *Communication submitted by:* | Ali Aarrass (represented by counsel, Dounia Alamat and Christophe Marchand) |
| *Alleged victim:* | The complainant |
| *State party:* | Morocco |
| *Date of complaint:* | 17 March 2017 (initial submission) |
| *Document references:* | Decision taken pursuant to rules 114 and 115 of the Committee's rules of procedure, transmitted to the State party on 28 March 2017 (not issued in document form) |
| *Date of present decision:* | 25 November 2019 |
| *Subject matter:* | Torture and ill-treatment in prison |
| *Procedural issues:* | None |
| *Substantive issues:* | Torture or cruel, inhuman or degrading treatment; solitary confinement; obligation of the State party to conduct a prompt and impartial investigation |
| *Articles of the Convention:* | 1, 2, 11, 12, 13, 14 and 16 |

1.1     The complainant is Ali Aarrass, a dual national of Belgium and Morocco, born on 4 March 1962 in Farjana, Morocco. He is currently being held in the Tiflet 2 prison and complains about the conditions of detention, including his placement in solitary confinement, which constitutes a violation of the State party's obligations under articles 1, 2, 11, 12, 13, 14 and 16 of the Convention. The State party ratified the Convention on 21 June 1993 and made the declaration pursuant to article 22 (1) of the Convention on 19 October 2006. The complainant is represented by counsel, Dounia Alamat and Christophe Marchand.[1]

---

\*     Adopted by the Committee at its sixty-eighth session (11 November–6 December 2019).

\*\*     The following members of the Committee participated in the examination of the communication: Felice Gaer, Abdelwahab Hani, Claude Heller Rouassant, Jens Modvig, Ana Racu, Diego Rodríguez-Pinzón, Sébastien Touzé and Bakhtiyar Tuzmukhamedov. Pursuant to rule 109, read in conjunction with rule 15, of the Committee's rules of procedure, and paragraph 10 of the guidelines on the independence and impartiality of members of the human rights treaty bodies (the Addis Ababa guidelines), Essadia Belmir did not participate in the examination of the communication.

[1]     Counsel has a power of attorney from the complainant.

GE.20-00011  (E)    140220    140220






1.2     The complaint included a request to the Committee for interim measures. On 28 March 2017, the Committee, pursuant to rule 114 of its rules of procedure, decided to act on the request for the taking of interim measures and requested the State party to ease the complainant's conditions of detention and to safeguard his rights while in detention, so as to avoid any irreversible damage while his complaint was being considered.

**The facts as submitted by the complainant**

2.1     The complainant was arrested and taken into custody on 1 April 2008 under an arrest warrant issued in connection with an extradition request from Morocco for so-called "terrorist" offences. At the time of the extradition request from Morocco, two investigations were being conducted by Spain for the offence of belonging to a terrorist group. These two procedures ended with decisions to dismiss the case.

2.2     The complainant consistently denied any involvement in criminal acts and challenged his extradition, in particular on the grounds that he was at risk of being subjected to torture and ill-treatment, to an unfair trial and to inhuman conditions of detention in Morocco. However, the Spanish Council of Ministers approved the complainant's extradition to Morocco on 19 November 2010.

2.3     On 25 November 2010, the complainant submitted a request for interim measures to the Human Rights Committee with a view to preventing the extradition. On 26 November 2010, the Human Rights Committee requested Spain not to extradite the complainant to Morocco.[2] Spain nevertheless surrendered the complainant to the Moroccan authorities on 14 December 2010.

2.4     During his long period of police custody in Morocco, the complainant was brutally tortured: injections, rapes, beatings, humiliation, threats, etc. As a consequence of these abuses, he signed a previously written confession in Arabic, a language he does not know well.

2.5     On 24 December 2010, the complainant was brought before the investigating judge, who neither took cognizance of the complainant's multiple injuries nor requested that an expert medical examination be carried out. Yet according to Mr. Lahcen Dadsi, the complainant's Moroccan counsel at the time, the signs of abuse were patently obvious.

2.6     On 22 April 2011, the complainant's case was referred to the Criminal Division of the Rabat Court of Appeal to be heard as a terrorism case in Salé. The Moroccan case file consists essentially of statements made by the complainant under torture.

2.7     In order to be acknowledged as a victim of acts of torture committed during his police custody, the complainant filed a criminal complaint in early May 2011. This complaint was dismissed. The complainant also submitted an application for the institution of criminal indemnification proceedings before an investigating judge, but this procedure was not duly conducted by the judge. Moreover, throughout the criminal proceedings against him, the complainant raised this obstacle to prosecution and requested that an independent and impartial investigation be conducted.

2.8     On 1 October 2012, the Criminal Division of the Rabat Court of Appeal sentenced the complainant to 12 years' imprisonment.[3] The complainant filed an application for review of this judgment but, to date, this procedure has not resulted in any decision.[4] The complainant has thus been in pretrial detention for nine years, as the judgment of conviction is not yet final.

---

[2]  *Aarrass v. Spain* (CCPR/C/111/D/2008/2010), para. 1.2. In its decision, the Committee found that the author's extradition to Morocco constituted a violation of article 7 of the International Covenant on Civil and Political Rights (para. 11).

[3]  The complainant had been sentenced at first instance to 15 years' imprisonment. On appeal, the sentence was reduced to 12 years' imprisonment.

[4]  The file does not contain any additional information indicating whether the Court of Cassation has ruled on the application for review.

2.9    Having submitted an application to the Human Rights Committee,[5] the complainant submitted a complaint to the Committee against Torture, which found a violation of articles 2, 11, 12, 13 and 15 of the Convention.[6] The subsequent investigation, however, has fallen far short of due process standards. As a result of the decision, Morocco reopened an investigation into the complainant's allegations of torture.

2.10   In its comments addressed to the Human Rights Committee, Spain stated that, at a meeting held on 17 November 2015, the Minister of Justice had submitted to it a decision of 20 October 2015 issued by Pretrial Division No. 4. This decision reportedly showed that the investigating judge ordered a medical examination, visited the police premises where the complainant was detained and took statements from police officers, nurses, doctors and persons detained during the same period as the complainant, as well as from third parties. The decision concluded by dismissing the allegations. As the complainant was not considered a party to the proceedings, he was not able to appeal. The investigation is therefore definitively closed.

2.11   Throughout his detention, the complainant has been subjected to threats, pressure, harassment, unjustified searches and beatings, among other violations, both by prison staff and by other inmates. He has been arbitrarily placed in isolation and deprived of sleep and essential medical care. His right to correspond has been restricted and even denied, and he is under surveillance even when he meets with his counsel. His legitimate grievances have never been taken into consideration; he has not been allowed to receive visits from his friends, his Belgian counsel, the Consul of Belgium or the Consul of Spain; and his requests for information have gone unanswered.

2.12   To protest his conditions of detention and the acts of intimidation he has suffered in relation to the complaints he has submitted at the national and international levels, the complainant has gone on several hunger strikes. The longest one, in 2015, lasted for 72 days and left the complainant in an alarming state of health, as a result of which he was hospitalized for several days.

2.13   At a time when he was again encountering significant problems in detention, the complainant was transferred, on 10 October 2016, to the Tiflet 2 prison, without prior notification to him or his family. He was held in solitary confinement under particularly harsh conditions, without being notified of any decision. The complainant is still being held in conditions that, given his history, amount to torture or, at the very least, to cruel, inhuman or degrading treatment. His physical and psychological health are very seriously endangered. The Moroccan authorities have been duly informed by the complainant's counsel and family of the consequences suffered by the complainant and have been called upon to house him in a regular cell, as they had done previously.

2.14   On 17 February 2017, the Minister of Justice merely stated that the complainant was not being held in solitary confinement as provided for in article 32 of Act No. 23/98 of 25 August 1999 on the organization and functioning of prison facilities and that the complainant had the use of an individual room, opportunities for recreation and access to a shower, in accordance with the law.

2.15   The National Human Rights Council of Morocco visited the Tiflet 2 prison twice, but did not react to the urgings of the complainant's counsel. Since his transfer to the Tiflet 2 prison, the complainant has lost 18 kg due to the dramatic deterioration in his conditions of detention.

2.16   Lastly, the complainant states that he has not submitted the complaint to any other procedure of international investigation or settlement, in accordance with article 22 (5) (a) of the Convention.

**The complaint**

3.1    The complainant claims a violation by the State party of articles 1, 2, 11, 12, 13, 14 and 16 of the Convention.

---

[5] See footnote 2.
[6] *Aarrass v. Morocco* (CAT/C/52/D/477/2011), para. 11.

3.2    In order to avoid irreparable damage resulting from the violation of the Convention, the complainant requests the adoption of interim measures of protection in the form of either release or prompt return to regular conditions of detention and, in this context, requests that his status as a victim and his particular family situation be taken into account.

3.3    The complainant requests the Committee to urge the State party to: (a) put an immediate end to the isolation imposed on him; (b) return him to regular conditions of detention so that he can have contact with other inmates, in particular during the daily recreation period; (c) allow him to be visited, if necessary, by members of the Committee against Torture; and (d) allow him to consult doctors outside the prison facilities. He also requests the Committee to urge the State party to allow him longer visits with his family, lasting at least one and a half hours, when they travel from abroad to see him; to be visited by the Consul of Belgium, his Belgian counsel, the Chair of his support committee and members of the Observatoire Marocain des Prisons (Moroccan Observatory of Prisons); and to allow him to receive the additional food brought to him by his family, as well as personal care items.

3.4    The complainant emphasizes that, while interim measures are usually intended to prevent an act of torture from being committed, that purpose suggests that they should also address cases of documented, ongoing treatment of a cruel, inhuman and degrading nature, given that such cases also entail a clear risk of irreparable damage.

3.5    The complainant adds that the Moroccan authorities have not adequately followed up on the decision taken by the Committee on his communication CAT/C/52/D/477/2011. Indeed, they do not treat the complainant as a victim of a violation of the Convention; on the contrary, they seem to be intent on destroying him. As a reminder, the complainant has lost 18 kg since his transfer to the Tiflet 2 prison.

**State party's observations on admissibility and the merits**

4.1    In a note verbale dated 9 June 2017, the State party submitted its observations on the circumstances of the complainant's detention.

4.2    The State party recalls that the complainant, by reason of his involvement in a terrorism case, was handed over to the Moroccan authorities under an extradition measure on 14 December 2010 and was taken into police custody on the same day. In this context, although the victim's family, who were informed that he had been taken into police custody, and the victim were entitled to seek legal and judicial assistance, they did not take any steps in that regard.

4.3    On 24 December 2010, the complainant was brought before the Crown Prosecutor General of the Rabat Court of Appeal, who did not note any signs of torture or ill-treatment and ordered that the complainant be brought, on the same day, before the investigating judge in charge of terrorism cases. Before the investigating judge, at his first hearing, the complainant stated that he had belonged to the Mujahidin Movement of Morocco since 1992 and requested legal assistance.

4.4    At that first hearing, the complainant did not raise any allegations of torture or ill-treatment and the judge did not note any signs or marks in that connection.

4.5    On 18 January 2011, assisted by his counsel, the complainant appeared for the second time before the investigating judge at a detailed hearing, and once again did not raise any allegations of torture or ill-treatment. His counsel did not raise any such allegations either, and the investigating judge did not observe any marks that could be likened to signs of torture or ill-treatment. In May 2011, almost six months after his first hearing with the investigating judge, the complainant filed a complaint alleging that he had been tortured. An investigation was carried out by the Crown Prosecutor General of the Rabat Court of Appeal, but as no evidence of the veracity of the allegations could be found, the complaint was dismissed. The results of a medical examination ordered by the Crown Prosecutor General and carried out by four doctors specializing in forensic medicine; neurology; trauma and orthopaedic surgery; and otorhinolaryngology led to the conclusion that the complainant's allegations were false, upon which the case was closed.

4.6     On 21 May 2014, in follow-up to the report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment,[7] the Crown Prosecutor General decided to reopen the case and request that an investigation be carried out by the investigating judge. The latter summoned the complainant in July 2014, but he refused to appear before the judge without counsel.

4.7     On 31 July 2014, the complainant was interviewed in the presence of his counsel and a certified interpreter. On 17 September 2014, the Crown Prosecutor General requested that a new medical examination be conducted and, on 19 September 2014, the investigating judge ordered that it be carried out by five doctors. The results of this new examination led to the conclusion that the allegations were unfounded and that signs of alleged torture or ill-treatment are difficult to find when a long period of time has elapsed since the alleged acts took place. On 20 October 2015, the investigating judge ordered a dismissal and decided to reclassify the case.

4.8     With regard to the complainant's application for review, the State party indicates that, after the complainant was prosecuted for participation in an association formed or an agreement reached for the purpose of preparing or committing acts of terrorism or acts that could disrupt public order, he was sentenced at first instance to 15 years' imprisonment, after which the sentence was reduced on appeal to 12 years' imprisonment. On 19 April 2014, the complainant's application for review was denied by the Court of Cassation.

4.9     With regard to the conditions of detention, the State party indicates that the complainant was transferred on 10 October 2016 to the Tiflet 2 local prison, a newly constructed facility that meets proper standards of detention and is intended for persons convicted in various cases or serving sentences of various kinds. He enjoys all his rights in accordance with international standards concerning detention and national legal and regulatory requirements, in particular those under Act No. 23/98. The complainant's transfer was carried out in the usual manner and in accordance with the regulations in force. In this context, the complainant was able to inform his sister of his transfer as soon as he arrived at the Tiflet 2 prison.

4.10    With regard to the complainant's current conditions of detention, his incarceration cannot in any way be considered "solitary confinement". In fact, he is being held in a well-ventilated, well-lit single-person cell with proper sanitary conditions. Since 1 April 2017, other inmates have been placed in his section of the prison, with the result that he is not alone when he goes outdoors for exercise.

4.11    It should be noted that the complainant has always refused to comply with the rules in force and has constantly encouraged other inmates to break the rules. He has proclaimed himself to be the defender and spokesperson of the other inmates, presents himself as their leader and has enlisted some of the more acquiescent inmates to serve him. He was the main instigator of the Salé 2 prison riot in May 2016.

4.12    What is more, the complainant continually provokes, insults and threatens prison officials. Like all other inmates in Moroccan prisons, the complainant is visited by his family members, relatives and counsel each time they come to the prison. In addition, as his family lives far away and is unable to visit him regularly, the prison administration allows him longer visits so that he can enjoy his family.

4.13    Like all other prisoners, the complainant is given meals that are prepared by an external company and meet nutritional requirements in terms of diversity, quantity, calories and preparation. His visitors can bring him food if they wish.

4.14    In terms of medical care, the complainant continues to be closely monitored by the prison doctors. His allegations of medical negligence are unfounded and are simply intended to mislead public opinion and portray him as a victim. In addition, he receives necessary medical assistance at the prison infirmary or at the hospital, and is given the medication prescribed for him, as shown by his medical record. Since his imprisonment on 30 March 2017, he has had 128 medical examinations at the facility, 10 examinations in different specialist areas at the hospital, 15 dental examinations and 12 visits to a

---

[7] A/HRC/25/60/Add.2.

psychologist. Lastly, the complainant follows a diet that the prison doctor recommended to him on 30 March 2017.

4.15 In response to the recurrent allegations about the complainant's conditions of detention, including falsified recordings, the General Delegation for Prison Administration and Reintegration of Morocco issued several press releases to refute the allegations. This use of disinformation and the distortion of the facts to mislead public opinion, with the sole aim of putting pressure on the prison administration, is unacceptable. In fact, the prison administration makes every effort to provide the best possible conditions of detention for all prisoners.

4.16 In conclusion, the State party explains that the General Delegation for Prison Administration and Reintegration sees to it that the law is observed in respect of all inmates, while guaranteeing that all of them, without discrimination, are able to exercise all their rights.

**Additional information from the complainant**

5.1 On 12 September 2017, the complainant submitted an update on his situation, stating that it has not improved despite the interim measures requested by the Committee. He remained in solitary confinement 23 out of 24 hours in very harsh conditions. The impact of these conditions was worsened by the fact that the complainant was still extremely weak. He was particularly concerned about the lack of medical care; the insufficiency and inadequacy of his food; the totally unjustified restrictions on his contacts with the outside world; and the fact that he still did not have adequate sleeping arrangements, as he continued to sleep on a concrete block.

5.2 On 20 February 2018, the complainant advised the Committee that his situation had not changed since March 2017. He was still in solitary confinement in unbearable conditions. Referring to the response of the General Delegation for Prison Administration and Reintegration, the complainant expressed surprise at the claim that it was his behaviour and actions that had "caused him to be placed in category A" and that it had been decided, in order to "encourage him to be more disciplined", to allow him to spend the outdoor recreation period in the company of other inmates instead of spending it alone, as he had done previously; this showed that the complainant had been held in solitary confinement.

5.3 The response of the General Delegation for Prison Administration and Reintegration also stated that the complainant, like all other inmates, was incarcerated under the conditions prescribed by Act No. 23/98. He had been transferred to the newly built Tiflet 2 local prison, a facility with adequate standards of detention that was intended for prisoners convicted in various cases and with different sentences, where he enjoyed all his rights in accordance with legal and regulatory requirements. According to the response of the General Delegation, his conditions of imprisonment could not be considered "solitary confinement". In fact, he was housed in a well-ventilated, well-lit single-person cell with all the necessary sanitary conditions. He was visited by family members and relatives whenever they came to the facility. He was allowed ample time to communicate with his family and was in regular contact with them by telephone, including his sister, wife, mother, father, brother and mother-in-law. His conditions of detention were determined by a classification system set up by the General Delegation in 2016 to improve the management of its facilities. The system was essentially linked to reintegration objectives based on motivation.

5.4 According to the State party, the complainant's previous behaviour and actions were the reason for his placement in category A. All information concerning this procedure had been presented to him and he had been informed that it fell within the competence of a specialized commission in accordance with established organizational rules. According to the General Delegation for Prison Administration and Reintegration, however, this classification system was not rigid or definitive, but a flexible and reactive mechanism that depended essentially on positive change in the inmate's behaviour. In fact, inmates' behaviour was evaluated every four months in the framework of a procedure to review the initial classification. Accordingly, after monitoring the behaviour of the complainant from the time of his transfer to the Tiflet 2 local prison until April 2017, the prison authorities

decided, in order to encourage him to be more disciplined, to allow him to spend his outdoor time in the company of other inmates instead of spending it alone, as he had done previously. Concerning his medical care, the General Delegation stated that the complainant was closely monitored by the prison doctor; that he had received all necessary medical assistance, either at the prison infirmary or at the public hospital, since the beginning of his imprisonment; that he regularly received the medication prescribed for him, as shown by his medical record; and that he followed a diet that the prison doctor had recommended to him on 30 March 2017.

**Complainant's comments on the State party's observations**

6.1   On 31 May 2018, the complainant reiterated that his conditions of detention unfortunately had not changed, despite the interim measures requested by the Committee. With regard to the developments since 11 September 2017, the complainant refers to a letter dated 12 September 2017 that he sent to both the Minister of Justice and the National Human Rights Council to complain about the failure to assess his conditions of detention. He stressed that the treatment inflicted on him clearly constituted arbitrary isolation for an indefinite and prolonged period. He complained about the draconian restriction of his contacts with his family, with whom he could speak by telephone for only 10 minutes a week. He also asked to be placed in the group regime, under which he had been held before 16 October 2016, when he was being held at the Salé 2 prison.

6.2   On 20 February 2018, in response to the letter dated 7 November 2017 from the General Delegation for Prison Administration and Reintegration, the complainant's counsel inquired about: (a) the conditions of detention applicable to category A inmates; (b) the differences between the conditions applied to the complainant and solitary confinement; (c) the results of the reassessment of the complainant's conditions of detention every four months; and (d) the issue of whether his views had been taken into account. Despite that request, no response has been received. The conditions of detention have not changed, and the complainant has never been informed of the reasons for these conditions. No reassessment of his situation seems to have been carried out, and none of his procedural rights have been respected.

6.3   In response to requests from Amnesty International, the Organisation marocaine des droits humains (Moroccan Human Rights Organization) visited the complainant. That association made a list of his grievances and recommended that he be held in a prison closer to his family, and that he be transferred to cell block B, so that he could be entitled to go outdoors twice a day and contact his family, especially as he had served more than two thirds of his sentence. His situation has not changed since then: he is still in solitary confinement in the same wing of the Tiflet 2 prison, and his opportunities for contact with his family have not improved. The recommendations of the Organisation marocaine des droits humains have not been implemented. On 9 March 2018, the complainant's sister stated that she had been able to speak to him by telephone for 5 minutes and 15 seconds and that the complainant was locked alone in his cell for 23 out of every 24 hours, with 1 hour in an exercise yard, but without any contact with the other inmates, either in the area where he was being held or outdoors. The conditions of detention remained difficult, and the atmosphere, very tense. He slept on concrete without a mattress, his diet was very poor and he had been asking for more than two weeks to see a doctor.

6.4   On 26 March 2018, one of his lawyers who had been able to visit the complainant summarized the situation as follows: "In essence, the conditions of the complainant's detention have not changed. He remains in the same damp and freezing cell at the far end of a wing with seven other detainees in pretrial detention at the other end. They do not talk to him and he does not want to talk to them for fear that this will cause new problems, such as suspicions of radicalization. Two of these detainees once started talking to him, and two days later, they were transferred to another wing."

6.5   In concrete terms, the complainant has the right to go outdoors once a day, to take a shower once a week, to eat boiled vegetables at lunchtime − but he has to pay for all other food − and to make two 5-minute telephone calls a week. He has no radio, but he can read. He has no other activity. In 2017, the situation was calm. Nevertheless, when he complained to a warden that other inmates had stolen his hair clipper, the warden was

displeased and accused the complainant of threatening him. Since then, this warden has given him a hard time: he insists that the complainant speak only in French, Arabic, Spanish or Riffian when using the telephone, so that the guard can monitor and understand him; he requires the complainant to go to the yard to cut his hair; prison staff come to his cell unexpectedly every day to tell him that the time to go out has arrived; prison staff regularly enter the shower block to watch him; and the complainant is no longer entitled to hot water, whereas it used to be available to him upon request every day. The complainant is very fearful of pressure and was subjected to serious pressure when he arrived at Tiflet 2 prison. The situation is unchanged. After a freezing winter, the complainant now faces, in these dire conditions, a scorching summer. He has been in detention for 10 years.

6.6   The complainant challenges most of the State party's observations. First, the State party includes among the "facts" some elements that are not the subject of the present proceedings, namely everything concerning the criminal proceedings that led to the complainant's conviction. Second, the State party takes no account whatsoever of the Committee's findings in communication CAT/C/52/D/477/2011, namely the violation of articles 2, 11, 12, 13 and 15 of the Convention. Given that a violation of article 15 of the Convention has been found, the only suitable and effective remedy is the reopening of the proceedings. However, the Court of Cassation dismissed the complainant's application in 2017. This decision was not duly notified, which unfortunately reflects a lack of will on the part of the State party to comply in practice with directly applicable international law, and this, in turn, has a negative impact on the observance of human rights in Morocco.

6.7   With regard to the conditions of detention, the complainant notes that the State party does not deny his allegations. It merely asserts that he is not in solitary confinement and that he enjoys all of his rights, thus insinuating that it would be discriminatory to treat him differently.

6.8   Referring to the details covered in his initial complaint, the complainant recalls, in response to the State party's claims, that his counsel did not receive any response to their last letter. He further stresses that the State party has never allowed an external doctor or the Belgian consular authorities to visit him, despite his repeated requests. Under these circumstances, the complainant's allegations should be held to have been substantiated and a violation of articles 1, 2, 11, 12, 13, 14 and 16 of the Convention should thus be recognized.

6.9   The complainant is also concerned about the claim, in the State party's observations, that he has always refused to comply with the rules in force and has constantly encouraged other inmates to break the law. He stresses that he has never been summoned to appear before the disciplinary board, yet it is within that framework that the problems referred to by the State party should in principle be addressed, in a manner that respects his right to a defence. This is the first time, apart from the letter of 7 November 2017, that the complainant has been accused of this type of behaviour. The prison administration had never tried to justify its actions by insinuating that the treatment suffered by the complainant was his fault.

6.10   As for the rebuttal of deficiencies in the provision of medical care, the State party still refuses to allow the complainant access to an external, independent, non-Moroccan doctor. The complainant's counsel still do not know the legal or regulatory basis for such a refusal.

6.11   The complainant also states that there have been no investigations into the source of the many signs of beatings found on his body. He recalls that the actions reported in this complaint are unfortunately not isolated.[8]

6.12   Accordingly, the complainant requests the Committee to find a violation of articles 1, 2, 11, 12, 13, 14 and 16 of the Convention and requests that the State party immediately release him and provide him with full, adequate and fair compensation for all of the Convention violations found to have occurred and for the consequences thereof.

---

[8] See CCPR/C/MAR/CO/6.

6.13    On 8 July 2019, the complainant reiterated that the conditions of his detention were still the same, despite the interim measures requested by the Committee and the conclusions of the Organisation marocaine des droits humains, which recommended that he be placed in a prison closer to his family members and that he be allowed to have more contact with them. As previously indicated, telephone contact with his family is limited to two 5-minute calls per week, to his wife and his sister, whereas these restrictions are not imposed on other inmates. However, even this minimum is not respected and the complainant's calls are monitored. The pressure on him remains intense, as he no longer receives his correspondence.

**Issues and proceedings before the Committee**

*Consideration of admissibility*

7.1    Before considering any complaint submitted in a communication, the Committee must decide whether or not it is admissible under article 22 of the Convention. The Committee has ascertained, as it is required to do under article 22 (5) (a) of the Convention, that the same matter has not been and is not being examined under another procedure of international investigation or settlement.

7.2    In accordance with article 22 (5) (b) of the Convention, the Committee must ascertain whether the complainant has exhausted all available domestic remedies, although this rule does not apply where the application of the remedies is unreasonably prolonged[9] or is unlikely to bring effective relief to the alleged victim. The Committee notes that, according to the State party, the complainant was sentenced at first instance to 15 years' imprisonment, after which the sentence was reduced on appeal to 12 years' imprisonment. On 19 April 2014, the complainant's application for review was denied by the Court of Cassation. The Committee further notes that the complainant made a submission to the General Delegation for Prison Administration and Reintegration to challenge the conditions of his detention, including his solitary confinement since his transfer to the Tiflet 2 prison in October 2016, whereas the State party claims that the complainant is being held under ordinary conditions of detention, without indicating whether any investigations have been conducted in this regard. Noting that the State party has not alleged that other domestic remedies are available to the complainant, the Committee therefore finds that the complainant has exhausted all available domestic remedies.

7.3    Not having found any other obstacles to admissibility, the Committee finds that the communication is admissible under article 22 of the Convention with respect to the alleged violation of articles 1, 2, 11, 12, 13, 14 and 16, and proceeds to consider it on the merits.

*Consideration of the merits*

8.1    The Committee has considered the present communication in the light of all the information made available to it by the parties, in accordance with article 22 (4) of the Convention.

8.2    The Committee notes the complainant's claims that: (a) the Committee's decision on communication CAT/C/52/D/477/2011 has not been implemented, and the investigation opened in response to that decision did not meet the standards of due process; (b) the conditions of his detention in the Tiflet 2 prison since October 2016 have not improved, as he has continued to be subjected to solitary confinement for a prolonged and indefinite period, without being provided with the rationale behind it and without reassessment of his situation at regular intervals, in accordance with his procedural rights; and (c) his contacts with his family are restricted, he has limited access to a doctor in prison and he has not been allowed the opportunity to be examined by an independent doctor or to be visited by Belgian consular authorities. The Committee also notes that the complainant has asked to be placed in the group regime, but to no avail.

8.3    The Committee also notes the State party's observations that: (a) the complainant enjoys all of his rights; (b) he is not in solitary confinement, but housed in a well-ventilated,

---

[9]    *Asfari v. Morocco* (CAT/C/59/D/606/2014), paras. 8.1, 8.2 and 12.2.

CAT/C/68/D/817/2017

well-lit single-person cell with proper sanitary conditions; (c) the duration of family visits is sufficient; (d) the complainant is in category A because of his previous behaviour and actions; (e) this regime is not rigid, but depends on the inmate's behaviour; (f) inmates' behaviour is reassessed every four months; and (g) to "encourage him to be more disciplined", the complainant is now allowed to spend his outdoor time in the company of other inmates.

8.4  The Committee observes that the complainant's counsel, who requested a regular reassessment of the complainant's detention regime, allegedly have not received a response from the State party to that request.

8.5  The Committee recalls its jurisprudence according to which solitary confinement may amount to a violation of article 16 of the Convention, depending on the circumstances of the case and taking into account the particular conditions of solitary confinement, the stringency of the measure, its duration, the objective pursued and its effect on the person concerned.[10] The Committee recalls its recommendation that solitary confinement and seclusion should be used as measures of last resort, for as short a time as possible, under strict supervision and with the possibility of judicial review.[11] The Committee also refers to rule 44 of the United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules), where solitary confinement is defined as the confinement of prisoners for 22 hours or more a day without meaningful human contact, and prolonged solitary confinement as solitary confinement for a time period in excess of 15 consecutive days.[12] In the present case, the Committee notes that the complainant was placed in solitary confinement for a long period of time. It also notes the complainant's contention that he was confined to his cell for 23 hours a day during his period of solitary confinement, with 1 hour a day for exercise and the opportunity to take a shower once a week. The Committee further notes the complainant's assertion that he was particularly vulnerable at the time, as he slept on the floor, without a mattress, and suffered from health problems and malnutrition. The Committee notes the State party's arguments that the complainant was placed alone in a cell owing to disciplinary sanctions, that the conditions of his imprisonment were ordinary and humane, and that he was entitled to regular contact with his family. The Committee recalls its jurisprudence concerning certain basic guarantees that must be applied to all persons deprived of their liberty in order to prevent them from being subjected to torture or ill-treatment. These guarantees include the right of detainees promptly to receive independent legal assistance and independent medical assistance and to contact relatives. In the present case, the Committee notes the complainant's assertion that solitary confinement and the State party's failure to provide clarification in this regard have caused him suffering and physical harm. The Committee observes that the complainant's detention regime amounted to solitary confinement, even if it was not classified as such under Moroccan law. The Committee is of the view that the complainant's solitary confinement and its duration, which were aggravated by the lack of periodic monitoring of this regime, his limited contact with his family and his irregular access to health care, were not proportional to the alleged disciplinary objective. The Committee therefore finds that the solitary confinement imposed on the complainant constituted a violation by the State party of its obligations under articles 16 and 2 (1), read in conjunction with articles 1 and 11, of the Convention.

8.6  The Committee notes the complainant's allegation that the State party did not provide him with redress for his ill-treatment in detention, in violation of his rights under article 14 of the Convention. The Committee recalls its general comment No. 3 (2012) on the implementation of article 14 and notes that article 14 is applicable to all victims of torture or ill-treatment. The Committee further recalls that article 14 not only recognizes the right to fair and adequate compensation, but also requires States parties to ensure that the victim of an act of torture or ill-treatment obtains redress. The Committee considers that redress should cover all the harm suffered by the victim, including restitution, compensation, rehabilitation of the victim and measures to guarantee that there is no

---

[10] *A.A. v. Denmark* (CAT/C/49/D/412/2010), para. 7.4.
[11] *Vogel v. New Zealand* (CAT/C/62/D/672/2015), para. 7.3.
[12] See also A/66/268, para. 26.

recurrence of the violations, while always bearing in mind the circumstances of each case.[13] The Committee notes that, in the present case, the complainant has remained in solitary confinement for a prolonged period of time, without an objective investigation into the circumstances of his isolation, and the fact that the conditions of his detention have not been eased has caused him unnecessary suffering. The Committee therefore finds that the complainant's rights under article 14 of the Convention have been violated.

8.7   In view of the foregoing, the Committee does not consider it necessary to examine separately the complainant's claims under articles 12 and 13 of the Convention.

9.   The Committee, acting under article 22 (7) of the Convention, is of the view that the facts before it disclose a violation of articles 16 and 2 (1), read in conjunction with articles 1 and 11, and of article 14 of the Convention.

10.   In accordance with rule 118 (5) of its rules of procedure, the Committee invites the State party to inform it, within 90 days from the date of the transmittal of the present decision, of the steps it has taken to respond to the above observations. Such steps must include the return of the complainant to the group regime in a prison closer to his family, the opening of an impartial and thorough investigation into the complainant's allegations, and the provision of full, adequate and fair compensation to the complainant for all the violations of the Convention that have been found and the consequences that they have had for the complainant.

---

[13] *Ali v. Tunisia* (CAT/C/41/D/291/2006), para. 15.8.